IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


PETER JOSEPH KLAUER,
      Petitioner,

vs.                            Case No. 3:07cv541/LAC/EMT

WALTER A. McNEIL,
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer and relevant portions of the state court record (Doc. 17). Petitioner filed a reply (Doc. 33). Petitioner then filed a "Motion to Amend the Record and Take Judicial Notice, or, in the Alternative, for an Evidentiary Hearing and Appointment of Counsel for Administrative Purposes" (Doc. 42), which is also before the court.

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 17, Exhibits; Doc. 33). Petitioner was charged in the Circuit Court for Escambia County, Florida, with one count of burglary with a firearm and mask (Count One), attempted sexual battery with a firearm and mask (Count Two), carrying a concealed firearm

(Count Three), possession of burglary tools (Count Four), and resisting arrest with violence (Count Five) (Doc. 17, Ex. A).  Following a jury trial, Petitioner was found guilty as charged on all counts (Doc. 17, Exs. K, N).  On October 7, 1992, Petitioner was sentenced as a habitual felony offender to a term of forty (40) years of incarceration on Count One, a consecutive term of twenty (20) years of incarceration on Count Two, and three concurrent terms of five (5) years of incarceration on Counts Three, Four, and Five, to run concurrently with the sentence imposed on Count Two but consecutively to the sentence imposed on Count One (Doc. 17, Exs. R, S).  Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA").  On April 22, 1994, the First DCA issued a written opinion finding no reversible error except as to the trial court's imposition of consecutive sentences; therefore, the court reversed and remanded the case for imposition of concurrent sentences (Doc. 17, Ex. Z).  Klauer v. State, 635 So. 2d 1018 (Fla. 1st DCA 1994). Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

Resentencing proceedings were held on August 19, 1994, during which the trial court vacated the sentence as to Count Two to the extent it imposed a consecutive sentence and ordered that the sentence on Count Two run concurrently with the sentences imposed on Counts One, Three, Four, and Five (Doc. 17, Exs. BB, CC).  Petitioner appealed the judgment to the First DCA (Doc. 17, Exs. DD, EE, FF, GG).  On August 15, 1995, the First DCA affirmed, with the mandate issuing August 31, 1995  (Doc. 17, Ex. HH).  Klauer v. State, 658 So. 2d 677 (Fla. 1st DCA 1995).

On August 12, 1997, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 17, Ex. JJ).  Petitioner filed a series of amendments, supplements, and legal memoranda (Doc. 17, Exs. KK, LL, MM, NN, OO, RR, PP, QQ).  The trial court held a limited evidentiary hearing on two of Petitioner's forty-six (46) claims (Doc. 17, Exs. UU, VV, WW).  Petitioner then filed another Rule 3.850 motion alleging newly discovered evidence (Doc. 17, Ex. XX).  The trial court denied all of Petitioner's claims in an order rendered on June 18, 2002 (Doc. 17, Ex. YY).  Petitioner appealed the decision to the First DCA, and on May 21, 2004, the appellate court issued a written opinion finding that only one of the issues raised on appeal was meritorious, that is, that Petitioner was illegally sentenced as a habitual felony offender; therefore, the appellate court reversed the trial court's order as to this claim and remanded

for resentencing (Doc. 17, Ex. HHH).  Klauer v. State, 873 So. 2d 555 (Fla. 1st DCA 2004).  The mandate issued June 8, 2004 (*id.*).

The final hearing on resentencing was held on August 3, 2005 (Doc. 17, Ex. WWW).  The sentencing court determined that Petitioner did not qualify for habitual felony offender status and sentenced him to forty (40) years of imprisonment on Count One, a concurrent term of twenty (20) years of imprisonment on Count Two, and three concurrent terms of five (5) years of imprisonment on Counts Three, Four, and Five, to run concurrently with the sentence in Count One (Doc. 17, Exs. WWW, ZZZ, AAAA).  Petitioner appealed the judgment to the First DCA, and on October 27, 2006, the appellate court affirmed the judgment per curiam without written opinion, with the mandate issuing December 27, 2006 (Doc. 17, Ex. LLLL).  Klauer v. State, 944 So. 2d 353 (Fla. 1st DCA Oct. 27, 2006) (Table).

On April 4, 2006, while the appeal of the resentencing judgment was pending, Petitioner filed a motion to correct sentence pursuant to Rule 3.800(b) of the Florida Rules of Criminal Procedure (Doc. 17, Ex. CCC).  The trial court summarily denied the motion in part and granted it in part in an order rendered on May 6, 2006 (Doc. 17, Ex. DDDD).  The motion was granted to the extent that Petitioner's sentencing scoresheet was corrected regarding a prior conviction, and his judgment and sentence were corrected to reflect that the attempted sexual battery count was a second degree felony (Doc. 17, Exs. DDDD, EEEE).

On April 12, 2007, Petitioner filed a petition for writ of habeas corpus alleging ineffective assistance of appellate counsel (Doc. 17, Ex. MMMM).  On August 1, 2007, the First DCA denied the petition per curiam without comment (Doc. 17, Ex. PPPP).  Klauer v. State, 963 So. 2d 272 (Fla. 1st DCA 2007).

Petitioner filed the instant habeas action on December 24, 2007 (Doc. 1 at 39).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[1]Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683

(2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d

662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

III.   EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[2] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

---

[2]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
          (A)  the applicant has exhausted the remedies available in the courts of the State; or
          (B) (i)  there is an absence of available State corrective process; or
             (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  Id. 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the

---

[3]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

case, that does so." <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The <u>Baldwin</u> Court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" <i>Id.</i>, 541 U.S. at 32.  With regard to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"<u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[4]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  <i>See</i> <u>Coleman v. Thompson</u>, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court

---

[4]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. <i>Id.</i>

even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available

---

[5]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

Id.

IV.    TRIAL EVIDENCE

A summary of the trial evidence adduced at Petitioner's trial provides a helpful context in reviewing Petitioner's claims.  Lois Jernigan, the victim, was the first witness to testify.  Ms. Jernigan testified that shortly after 2:00 a.m. in the early morning hours of April 5, 1992,[6] she was awakened by her dog barking, so she went downstairs to a small entry area of her home, which opens into her carport, to calm the dog and look into the carport (Doc. 17, Ex. K at 74–75).  She did not see anything, so she proceeded upstairs and looked out a window to the backyard (id. at 75).  Again, she did not see anything, so she went to the kitchen and looked out the window onto the street (id. at 75–76).  She saw a person walking close to her driveway heading toward her front door (id. at 76).  She ducked from view, called 911, and reported that a man was walking in her front yard (id.).  After the man had been at her front door for approximately five seconds, she saw the man walk back toward her driveway (id. at 77).  The victim testified that her front door is a double door with large glass windows on both sides of the door, so if someone walked up to her front door that night and looked in, he would be able to clearly see inside the house (id. at 91–92).  The victim testified that the man was wearing a black T-shirt and blue jeans, and he appeared to have a bandanna tied around his head like a sweatband (id. at 78).  The victim said she saw a police officer

---

[6]The victim testified that she had not yet changed the time on her clocks to one hour later in accordance with Daylight Savings Time (id. at 74).

arrive, so she walked toward the back of the house to look out the window to the backyard and saw a man looking at her through the back window (*id.* at 79).  The victim testified she saw the man "[do] a 'double-take,'" then stop and look at her, and then she saw the motion of a hand move up and over the man's head (*id.*).  The victim stated she saw the man turn around and walk down her back stairs, and she saw a police officer with him at the bottom of the stairs (*id.* at 80).  The victim then looked in a tree in her backyard and saw a mask and two gloves in the tree (*id.* at 80–81).  The victim additionally testified that when she arrived home that night at approximately 8:15 p.m., she did not see a tote bag near her driveway (*id.* at 81).  On cross-examination, the victim was asked whether she initially reported to 911 that a black male was outside her home, and she responded that she did not recall her exact words (*id.* at 126).  She was also asked whether she reported that the prowler was carrying a flashlight, and she responded that she did not recall reporting a flashlight (*id.*).

Officer Sheehan testified that she was dispatched to the victim's home after a report that a black male was prowling around the house (*id.* at 186).  Officer Sheehan testified that when she arrived at the victim's home, she began walking up the victim's driveway and saw a green tote bag near the driveway as she approached the victim's carport (*id.* at 137–38, 150, 167–73).  She also saw a figure in the victim's carport (*id.*).  As she drew closer, she saw Petitioner at the front of a van parked in the carport (*id.*).  She then saw Petitioner move to the passenger side of the van, still in the carport, and kneel down (*id.*).  Officer Sheehan yelled, "Police, halt," and Petitioner ran through a gate toward the back of the house and up the back stairs that led to the balcony at the rear of the house (*id.*).  Officer Sheehan testified that after she apprehended Petitioner, she found wire cutters in his pocket (*id.* at 142).  She testified that Petitioner was wearing blue jeans and a black T-shirt, and he was carrying a can of beer in his hand (*id.* at 143).  Officer Sheehan testified that she discovered a ski mask and a surgical glove stuck in the limbs of a tree on the right side of the back stairs of the victim's house where she apprehended Petitioner, and she saw another surgical glove on the ground just below the tree (*id.* at 144–45).  She further testified that when she searched the green tote bag that she saw near the driveway, its contents included a loaded .38 caliber Colt revolver, ammunition, crowbar, racquetball, screwdriver, butcher knife, nylon dog leash, condoms, a roll of surgical tape, a ski hat, and surgical gloves (*see* Doc. 17, Ex. K at 138–48).

Michael Flores, a dispatcher with the Pensacola Police Department, testified that he received a call regarding a prowler at 3:22 a.m. on April 5, 1992, from the victim's address (*id.* at 314–15). He testified that the caller described the prowler as a black male wearing blue jeans and a bandanna and carrying a flashlight, and that was the description he gave to officers (*id.* at 315–16).

Officer Stallworth, an officer who arrived at the scene after Officer Sheehan, testified that the dispatcher described the prowler as a black male wearing a stocking cap (*id.* at 202).

Steve Ordonia, an investigator with the Pensacola Police Department, testified that he had attended two training classes regarding investigation of sexual crimes against persons (*id.* at 270). He testified that he participated in the search of Petitioner's car located at the house next door to the victim's and found binoculars, a gym bag, and protective eyewear commonly used when playing sports (*id.* at 271–72, 297–98).

Clarence West, a crime scene technician, testified that he took fingerprint lifts from the green tote bag and the items found in the tote bag, and forwarded the lifts to Hilda Jordan, a fingerprint examiner (*id.* at 213, 215). He testified that he also sent hair samples from the ski hat and ski mask and the roll of surgical tape to the Florida Department of Law Enforcement (FDLE) lab for testing (*id.* at 215–16).

Hilda Jordan, testified that of the five fingerprint lifts, she was able to identify only three of them, and she identified those three as belonging to Officer Sheehan (*id.* at 222–23).

Marta Straucer, a crime laboratory analyst with the FDLE, testified that she examined the ski cap, ski mask, and trace evidence from the roll of surgical tape (*id.* at 319–22). She testified that there was one Caucasian body hair present on the surgical tape, but it was not suitable for comparison purposes (*id.* at 322–23). She testified that there were two Caucasian hairs suitable for comparison on the ski cap found in the tote bag, and neither hair originated from Petitioner (*id.* at 323–24). She testified that there were two animal hairs and one Caucasian body hair on the ski mask, but none were suitable for comparison purposes (*id.* at 324).

David Loutner, the contractor who was constructing the house next to the victim's, testified that after April 5, 1992, the night of the crimes, the construction site was vandalized twice (*id.* at 237, 243). The first time, someone turned on the water in the house, and the second time they again turned on the water and threw paint cans around the garage (*id.* at 243–44).

Helen Shandley testified by deposition (*id.* at 246–52). She testified that in 1977, she and her husband lived in Dubuque, Iowa, and operated a store called the Dubuque Yacht Basin (*id.* at 246–47). She testified that they had a license to sell firearms at the store (*id.* at 247). Ms. Shandley identified a firearms transaction record, number 16-0223269, as a form completed in her store on July 7, 1977, for a .38 caliber Colt pistol with the serial number H51612 (*id.* at 247–48). She testified that the purchaser of the firearm was Ward J. Sherrer, who resided at 2367 Maplewood, Dubuque, Iowa (*id.* at 248).

June Claire Sherrer also testified by deposition (*id.* at 252–62). She testified that she and her husband, J. Ward Sherrer, lived on Maplewood Drive, in Dubuque, Iowa in 1977 (*id.* at 253–55). She testified that she did not recall whether her husband bought the gun (*id.* at 256–58). She also testified that she and her husband divorced in December of 1978, and an attorney named Robert Klauer in Dubuque represented her in the divorce (*id.* at 254, 258).

Patrick Eggen testified that he was employed with the police department in Dubuque, Iowa for twenty-nine years (*id.* at 262–63). He testified that he knew Petitioner as a former resident and lawyer in Dubuque since the early 1970's (*id.* at 263, 265). Mr. Eggen testified that he also knew an attorney named Robert Klauer, and that in 1981–84 Robert Klauer and Petitioner shared office space (*id.* at 264). Mr. Eggen also identified a price tag located on the box of condoms found in the green tote bag as a "Snyder" price tag (*id.* at 264, 147). He testified that the full name of the drug store is Hartig-Snyder, which was known as Hartig's drugstore for a number of years and changed to Hartig-Snyder in the past two years (*id.* at 438–49). He testified there are four or five Hartig-Snyder drug stores the city of Dubuque, one in nearby Golino, and one in nearby Dyersville (*id.* at 264–66, 440). He testified there are also stores in Illinois (*id.* at 440–41). Mr. Eggen testified that some of the price tags on items from the Snyder store in Dubuque are marked "Snyder" and some are marked "Hartig-Snyder," and he did not know which store the box of condoms was purchased from (*id.* at 265–66).

John Fudala testified that he had known Petitioner since September of 1991, and he had never seen a firearm, ammunition, or gun cleaning equipment in Petitioner's home or in his vehicle (*id.* at 336, 338). He also testified that he had never seen the green tote bag, and although Petitioner had a dog, he had never seen any dog leashes (*id.* at 339–40).

Chris Gordon provided essentially the same testimony, except he stated he had been to Petitioner's home only once (*id.* at 342–46).

Mike Sly testified that he had known Petitioner for approximately two years and had been to his residence many times (*id.* at 358–59).  He testified that they exercised together at least three times a week (*id.* at 360–61).  He also testified that he had never seen the green tote bag, and although Petitioner had a dog, he had never seen any dog leashes (*id.* at 361–62).  He testified that he never knew of Petitioner playing racquetball (*id.* at 368).  He testified that he was at Petitioner's house on April 4, 1992, but left at 5:00–6:00 p.m. (*id.* at 363–67).

John Hughes testified that he had known Petitioner for thirty to thirty-five years (*id.* at 376).  He testified that he helped Petitioner relocate from Dubuque, Iowa to Pensacola in January of 1990 or 1991 (*id.* at 377–78).  He testified that he packed Petitioner's household items and toiletries and unpacked them in Pensacola, and he never saw the green tote bag, box of condoms, dog leash, or any evidence that Petitioner possessed a firearm (*id.* at 378–81).  Mr. Hughes further testified he had been a resident of Dubuque since 1983, and he had never heard of Snyder drug store or "Helig" in Dubuque (*id.* at 396–97).  He also admitted that he did not pack every box, and that this was not the first time that Petitioner had moved to Pensacola (*id.* at 399).  Mr. Hughes testified that Petitioner had previously moved to Pensacola but still had some belonging at his father's house in Dubuque, and when he (Hughes) helped Petitioner move, it was to bring Petitioner's remaining items from Dubuque and to relocate Petitioner's father to Pensacola (*id.* at 399–400).  Mr. Hughes admitted that he did not know what items Petitioner had in his residence in Pensacola before Hughes helped him move his belongings from Iowa (*id.* at 400).  Mr. Hughes testified that he is Petitioner's cousin, and neither of them is related to Robert Klauer (*id.* at 401).

Arthur Hall, the victim's neighbor, testified that prior to April 5, 1992, he experienced three instances of prowlers or unusual circumstances around his home (*id.* at 402, 415).  The first instance occurred in the summer of 1991, when someone poured a liquid other than gasoline into his new lawnmower, which was parked in his carport (*id.* at 415).  The second instance occurred near Christmas of 1991, when one or two Christmas gifts were taken from his wife's car, which was parked in the carport (*id.* at 415–16).  The third incident occurred in 1992, prior to April 5, when someone entered his jeep and tossed papers on the floor and on the seats (*id.* at 416).  Mr. Hall

testified that all of the incidents occurred in the evening (*id.* at 415–16).  He further testified that on one or two occasions prior to April 5, 1992, the victim asked him to come to her house because she suspected a prowler (*id.* at 417–18).

Margaret Sudrith, Petitioner's daughter, testified that in the spring or early summer of 1987, Petitioner's wife, Petitioner's father, and she discussed how to dispose of Petitioner's firearms (*id.* at 477–79).  She testified that they decided that Petitioner's wife would take them to Petitioner's father, and he would dispose of them (*id.* at 479).  She further testified that Petitioner relocated to Pensacola in January of 1990 (*id.* at 479).  Ms. Sudrith testified that in May of 1992, after Petitioner's arrest, she and her husband traveled to Pensacola to pack Petitioner's belongings (*id.* at 480).  She testified that she did not observe anything that would evidence his owning a firearm, such as holsters, ammunition, or a cleaning kit, nor did she see any condoms (*id.* at 481–82).

Petitioner testified that Dubuque, Iowa was his "permanent" address (*id.* at 489).  He testified that he and his wife separated on September 13, 1991, but they were still legally married in April of 1992 (*id.* at 490).  Petitioner stated that in 1987 he was convicted of three federal felonies, obstruction of justice, conspiracy to intimidate a witness, and intimidation of a witness (*id.* at 490–91, 534, 543–44).  He testified that he was sentenced to concurrent terms of four years, three years, and three years, respectively, and he actually served only two years, four months of which was served in Pensacola at a halfway house and under house arrest (*id.* at 492).  He testified that he and his wife first lived in Pensacola on a temporary basis—he was residing in a halfway house in Pensacola, and his wife rented an apartment in Pensacola so they could spend weekends together (*id.* at 494–95).  He testified that when he was released, they spent three months in Pensacola and then moved back to Iowa (*id.* at 494–95).  He testified that he met the victim in July of 1991, when his wife contacted Cokesbury Methodist Church to inquire if they were interested in subscribing to the Klauers' vehicle maintenance service (*id.* at 498–99).

Petitioner testified regarding his activities on April 4 and 5 of 1992 (*id.* at 503–32).  He testified that he drove by the victim's house at approximately 2:15 a.m. on the morning of April 5,

1992,[7] to determine if the victim was home; he stated, "I guess I was curious about what she was doing and about who she was out with, . . . and I guess I was interested in—in a relationship with her." (*id.* at 514–15, 553).  He testified he had been walking in the area of the victim's home before and knew that the house next door to the victim's was under construction, so he parked his car at the house next door in a position where he could "see her activities when she got to the door, and I could discern if it was a goodnight kiss or invited the guy in and all the lights went off . . . and I could tell what kind of a relationship she was having if she, in fact, came home with a man" (*see id.* at 515, 553–55).  Petitioner testified that he sat in his car and opened a car of beer, and then exited the car, carrying the can of beer, and walked in front of the victim's home (*id.* at 516, 518, 558).  He testified he walked to the front of the house because he "wanted to get a panorama of this front door as I walked by" to discern if there was any movement inside and, if so, who it was (*id.* at 558–59).  He testified he saw the victim's car parked in the carport and decided to feel the radiator and hub of the wheel to determine if either was warm, which would indicate the victim had recently returned home (*id.* at 518, 559–60).  He testified that he heard what he believed to be footsteps on the driveway coming in his direction, so he went through the gate to the victim's backyard and began to ascend steps that led to a balcony of the house, when he heard a police officer tell him to stop (*id.* at 519).  He took two more steps and stopped, then turned and walked back down the stairs, where he was met by Officer Sheehan (*id.* at 519). Petitioner admitted he had "wire snips" in his pocket (*id.* at 508–09, 520).  Petitioner testified that the police questioned him about the green tote bag, but he denied that he had ever seen it before (*id.* at 525).  Police also questioned him about an accomplice, specifically, a black man, but he told them that no one else was with him (*id.*).  Petitioner acknowledged that he may have brushed his hair with his hand while he was on the victim's back steps, but he denied he was wearing a mask or gloves, and he denied taking any of the items found in the tote bag with him to the victim's home (*id.* at 531–32, 534, 540–41).  He testified that he did not see the tote bag near the driveway when he was walking around the victim's home (*id.* at 563).  He further testified that he did not know anything about the gun, and he had never heard of the

---

[7]Petitioner testified that he had not realized that the time had just changed to one hour later due to Daylight Savings time, so it was actually 3:15 a.m. (*id.* at 521).

Sherrers, the registered owners (*id.* at 532, 562).  He testified he had not had possession of a weapon since his federal convictions in 1987 (*id.* at 539).  Petitioner further testified that he, his father, and two other attorneys rented office space from Robert Klauer from 1981 or 1982 to 1984 (*id.* at 532–33).  He testified that he had not been in Dubuque since January of 1990, and he was familiar with Hartig stores but had never heard of Snyder stores (*id.* at 533).  He testified that he used the protective eyewear found in his trunk to play tennis, but he had not played racquetball in approximately six years (*id.* at 535).  He denied that he intended to burglarize the victim's home or attempt a sexual battery upon her on April 5 (*id.* at 536).

## V.   PETITIONER'S REQUEST FOR EVIDENTIARY HEARING AND DISCOVERY

Before addressing Petitioner's claims, the court will address his request that the court take judicial notice of photographs of the victim's house and front yard included in the court file of United States v. Peter J. Klauer, Case No. 92-03049-01-RV (N.D. Fla. 1992), or the file of the United States Attorney in that case (*see* Doc. 42).  Petitioner alternatively requests an evidentiary hearing on the factual issue of whether the victim's front yard was enclosed in any way (*id.*).

Federal law limits the circumstances under which this court may conduct an evidentiary hearing on a federal habeas claim.  First, Petitioner must make the required showings set forth in 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>   (A) the claim relies on--
>    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)

If the court determines that the factual basis of the claim was indeed developed in the state courts, section 2254(e)(2) is surmounted, and an evidentiary hearing is permissible.  Williams, 529 U.S. at 429–40.  If the factual basis was not developed, the court then must determine whether

Petitioner "failed" to develop the factual basis.  In this analysis, Petitioner must show that this result was not due to a "lack of diligence, or some greater fault, attributable to the [petitioner]."  *Id.* at 432.  "Diligence" depends upon "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court."  *Id.* at 435.  It does not depend on whether the attempt was successful.  *Id.*  "[A] person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance.  Fault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all."  *Id.* at 432.  Diligence will ordinarily require that the petitioner seek an evidentiary hearing in state court.  *Id.* at 437; Dowthitt v. Johnson, 230 F.3d 733, 758 (5th Cir. 2000); Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998).  However, where despite diligent effort the petitioner is denied in his request or is otherwise prevented from developing the facts of his claim by the state court, a federal evidentiary hearing is not barred under section 2254(e)(2).  Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir. 2000); Miller, 161 F.3d at 1253 (collecting cases).

If the court determines that Petitioner failed to develop the factual basis of his claim in the state court, a hearing is prohibited unless Petitioner can establish one of the narrow exceptions set forth in subsections (e)(2)(A) and (B).  If the lack of factual development is not attributable to any failure of Petitioner, or if Petitioner establishes one of the exceptions, the federal court then must determine whether a hearing is appropriate or required under Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), *overruled on other grounds*, 504 U.S. 1, 112 S.Ct. 1715, 118 L. Ed. 2d 318 (1992).  Under Townsend, if Petitioner did not receive "a full and fair evidentiary hearing" in the state courts, and if Petitioner "alleges facts which, if proved, would entitle him to relief," he is entitled to an evidentiary hearing in federal court.  372 U.S. at 312–13.  However, if the federal petition advances only claims that are "patently frivolous" or "based upon unsupported generalizations," an evidentiary hearing is not required.  Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989) (quoting United States v. Guerra, 588 F.2d 519, 520–21 (5th Cir. 1979)).  Equally, this court need not conduct a hearing on Petitioner's claims, even if supported by affidavits, "where the record conclusively establishes that he is not entitled to relief on [those claims]."  Davis v. Singletary, 119 F.3d 1471, 1473 (11th Cir. 1997); *see also* Spaziano v. Singletary, 36 F.3d 1028, 1037 (11th Cir. 1994); Bolender v. Singletary, 16 F.3d 1547, 1565 n. 25 (11th Cir. 1994).

Under Florida law, a Rule 3.850 motion when initially filed must include "a brief statement of the facts (and other conditions) relied on in support of the motion." Fla. R. Crim. P. 3.850(c)(6). Unless the motion and record conclusively show that the movant is not entitled to relief, an evidentiary hearing must be held. *See* Gaskin v. State, 737 So. 2d 509, 516 (Fla. 1999). More specifically, "[t]he movant is entitled to an evidentiary hearing on a claim of ineffective assistance of counsel if he alleges specific 'facts which are not conclusively rebutted by the record and which demonstrate a deficiency in performance that prejudiced the defendant.'" *Id.* (quoting Roberts v. State, 568 So. 2d 1255, 1259 (Fla. 1990)). The rule does not require the movant to support his allegations with affidavits, nor does it require him to identify specific witnesses or the nature of their testimony. *Id.* at 514; Peede v. State, 748 So. 2d 253, 258 (Fla. 1999). However, mere conclusory allegations are insufficient; the movant must plead with sufficient specificity the factual grounds upon which he relies. Smith v. State, 445 So. 2d 323, 325 (Fla. 1983); *see also* Cunningham v. State, 748 So. 2d 328, 329–31 (Fla. 4th DCA 1999) (finding that neither Gaskin nor Peede abrogated Smith's requirement that a Rule 3.850 motion contain specific allegations of fact).

In this case, the undersigned finds that Petitioner included in Ground 32 of his Rule 3.850 motion the argument that defense counsel should have argued that there was no evidence that Petitioner entered a dwelling or structure while armed or that he became armed within a dwelling or structure (*see* Doc. 17, Ex. MM at 276–78). Petitioner additionally claimed that defense counsel should have objected to the trial court's erroneous substitution of the word "or" for "of" in the definition of "structure" because the substitution permitted the jury to convict him of armed burglary even though the gun was located in an unenclosed area of the victim's front lawn (*id.*). Petitioner argued that the photographs admitted as evidence at trial showed that the green tote bag containing the gun was located to the side of the victim's driveway, and there was no type of enclosure around that area (*id.*). He claimed that as a result of counsel's errors, the jury convicted him of armed burglary despite the lack of any evidence that he had a gun in a structure or dwelling (*id.*). It therefore appears that Petitioner met the threshold requirement for pleading a Rule 3.850 motion. Additionally, Petitioner requested that the state court expand the evidentiary hearing on his Rule 3.850 motion to include the issue of whether trial counsel was ineffective for failing to argue that there was no evidence that Petitioner entered a dwelling or structure while armed or that he became

armed within a dwelling or structure, as well as counsel's failure to object to the trial court's erroneous substitution of the word "or" for "of" in the definition of "structure"(*see* Doc. 17, Ex. QQ).  The state court denied Petitioner's request (*see* Doc. 17, Ex. SS at 606) and denied relief on this claim on the ground that counsel actually did argue that the State did not present any evidence that Petitioner was armed, and with regard to counsel's failure to object to the jury instruction, Petitioner failed to show that he was prejudiced by counsel's failure to object to the instruction (Doc. 17, Ex. YY at 799–800).  Because this holding effectively precluded any further development of the factual basis for Petitioner's claims, this court cannot conclude that Petitioner lacked diligent effort in the pursuit of his claim.  Accordingly, section 2254(e)(2) does not prevent Petitioner from gaining an evidentiary hearing in this court.

The next step is to determine whether Petitioner is entitled to a hearing under <u>Townsend</u>.  As will be discussed herein, this court finds that the record conclusively establishes that Petitioner is not entitled to relief on his claims.  *See* <u>Davis</u>, 119 F.3d at 1473.  Accordingly, an evidentiary hearing is not necessary to the disposition of this petition.

VI.     PETITIONER'S CLAIMS

   A.     Ground one:  "Petitioner's right to trial by jury and proof beyond a reasonable doubt was violated in his 2005 resentencing."

Petitioner claims that upon remand of his case to the trial court for resentencing on August 3, 2005, the trial court imposed an upward departure in his sentences on Counts One and Two to forty (40) years and twenty (20) years, respectively, pursuant to Florida Statutes Chapter 921, based upon factual findings which were not made by a jury beyond a reasonable doubt, in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) and <u>Blakely v. Washington</u>, 5542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (Doc. 1 at 10–13, 42–43).  Petitioner contends the Florida sentencing scheme set forth in Chapter 921, which provides for upward departures based upon factual findings made by a judge by a preponderance of the evidence, is unconstitutional under <u>Apprendi</u>, <u>Blakely</u>, and its progeny (*id.*; *see also* Doc. 33 at 6–16).

   1.     Clearly Established Federal Law

In <u>Apprendi v. New Jersey</u>, the Supreme Court held that "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum

must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Apprendi involved a New Jersey hate-crime statute that authorized a 20-year sentence, despite the usual 10-year maximum, if the judge found the crime to have been committed "'with a purpose to intimidate . . . because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" 530 U.S. at 468–69 (quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp.1999–2000)). In Ring v. Arizona, 536 U.S. 584, 592–93, and n.1, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Supreme Court applied Apprendi to an Arizona law that authorized the death penalty if the judge found one of ten aggravating factors. In each case, the Court concluded that the defendant's constitutional rights had been violated because the judge had imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding, and the challenged finding had not been made by a jury beyond a reasonable doubt. Apprendi, *supra*, 530 U.S. at 491–97; Ring, *supra*, 536 U.S. at 603–09.

In Blakely, the defendant pleaded guilty to kidnaping his estranged wife. 542 U.S. at 298. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months, but the judge imposed a 90-month sentence after finding that the defendant had acted with deliberate cruelty, a statutorily enumerated ground for departing from the standard range. *Id.* The Court clarified that "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant, not the maximum sentence a judge may impose after finding additional facts. Blakely, 542 U.S. 303–04. Applying Apprendi, the Court invalidated Blakely's sentence because the facts supporting his exceptional sentence were neither admitted by him nor found by a jury, therefore, the sentence violated his Sixth Amendment right to trial by jury. *Id.* at 313–14.

2.      Federal Review of State Court Decision

This claim was raised in the First DCA on appeal of Petitioner's resentencing (*see* Doc. 17, Exs. HHHH, IIII, JJJJ). The First DCA affirmed the resentencing judgment and sentence per curiam without written opinion (*id.*, Ex. LLL). Klauer v. State, 944 So. 2d 353 (Fla. 1st DCA Oct. 27, 2006) (Table).

Although the state court's denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court

decision unless review of the record shows that decision to be unreasonable.  *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

In the instant case, the verdict form demonstrates that the jury found Petitioner guilty of burglary with a firearm and mask (Count One), attempted sexual battery with a firearm and mask (Count Two), carrying a concealed firearm (Count Three), possession of burglary tools (Count Four), and resisting arrest with violence (Count Five) (Doc. 17, Ex. N).  Under Florida law at the time of Petitioner's offense conduct, armed burglary was a first degree felony punishable by a term of imprisonment for life or by a term of imprisonment not exceeding forty (40) years.  Fla. Stat. §§ 810.02(2)(b), 775.082(3)(a), 775.087(1)(a), 775.0845 (1991).  Attempted sexual battery with a firearm was a second degree felony punishable by a maximum of fifteen (15) years of imprisonment, *see* Fla. Stat. §§ 794.011(3), 775.082(3)(c), 777.04(4)(b) (1991); however, the fact that Petitioner was wearing a mask, a factual finding made by the jury beyond a reasonable doubt, made the crime punishable as if it were a felony of the first degree, so it was punishable by a term of imprisonment not exceeding thirty (30) years, *see* Fla. Stat. §§ 775.0845(4); 775.082(3)(c).  Carrying a concealed firearm, possession of burglary tools, and resisting arrest with violence were each a third degree felony punishable by a maximum of five (5) years of imprisonment.  Fla Stat. §§ 790.01, 810.06, 843.01, 775.082(3)(d) (1991).

At resentencing, Petitioner was sentenced to forty (40) years of imprisonment on Count One, a concurrent term of twenty (20) years of imprisonment on Count Two, and three concurrent terms of five (5) years of imprisonment on Counts Three, Four, and Five, to run concurrently with the sentence in Count One (Doc. 17, Exs. AAAA, CCCC, DDDD, EEEE).  None of Petitioner's sentences exceeded the statutory maximum, *see* Blakely, 542 U.S. 303–04.  Therefore, the sentences did not violate the constitutional principles established in Apprendi or its progeny.  Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

B.      Ground two:  "Failure to perform demanded cumulative error review in summarily denying both of Petitioner's Rule 3.850 motions."

Petitioner complains that the Rule 3.850 court denied most of his claims without an evidentiary hearing, and the court summarily denied many of his claims on the ground that he failed

to sufficiently allege or show he was prejudiced by the alleged constitutional error, often without determining whether an error actually occurred (Doc. 1 at 10, 15–16).  Petitioner argues the state court "misapplied the law" by analyzing each claim for harmless or prejudicial error without considering the cumulative effect of the errors, even though many of Petitioner's claims were "factually interlocked," and the combined effect of the individual errors affected the outcome of his trial (*id.* at 16–30).

Respondent contends this claim is procedurally defaulted because Petitioner did not fairly present a claim of cumulative error to the trial court as an independent ground for relief in his Rule 3.850 motion, rather, Petitioner raised it for the first time on appeal of the trial court's denial of his motion as Issue I in his initial brief (Doc. 17 at 34–48).  Respondent argues that although Petitioner mentioned or alluded to cumulative error in seven (7) separate pages interspersed among five (5) post-conviction filings and more than 350 pages of material in total, this was insufficient to alert the trial court that Petitioner was raising an independent claim that the cumulative effect of the individual alleged errors was not harmless (*see id.* at 42–43).  Respondent additionally claims that Petitioner presented the issue to the state appellate court only as an issue of state law, citing only state court decisions that did not alert the First DCA that Petitioner's claim was grounded in the federal Constitution (*id.* at 48–52).  Respondent contends Petitioner may not return to state court to present a federal claim because state procedural rules bar him from filing a successive Rule 3.850 motion, and Petitioner has failed to overcome the procedural bar with a sufficient showing of cause and prejudice or actual innocence (*id.* at 52–56).

In his reply, Petitioner concedes that he did not raise cumulative error as an independent ground for relief in his Rule 3.850 motion (Doc. 33 at 18–20), but he contends he demanded cumulative error analysis several times in his post-conviction filings and cited Kyles v. Whitley, 514 U.S. 419 (1995), Strickland v. Washington, 466 U.S. 668 (1984) and Brady v. Maryland, 373 U.S. 83 (1963) in those arguments (*id.* at 25–26).  Petitioner further contends that the state cases he cited in his appellate brief to the First DCA relied upon Supreme Court cases, and this was sufficient to alert the First DCA of the federal constitutional nature of his claim (*id.* at 21–26).

Initially, to the extent Petitioner challenges the review process afforded him in the state post-conviction proceedings, this ground for relief does not state a claim cognizable on federal habeas.

It is well established in the Eleventh Circuit that a § 2254 court is not an appropriate forum for a prisoner who wishes to challenge the process afforded him in state collateral proceedings.  This is so, because such a claim represents an attack on a proceeding collateral to the prisoner's confinement and not the confinement itself.  Quince v. Crosby, 360 F.3d 1259, 1261–62 (11th Cir. 2004) (affirming district court's denial of habeas relief based on state court judge's refusal to recuse himself from the Rule 3.850 hearing, explaining "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (per curiam) (concluding § 2254 claim that petitioner's due process rights were violated when state post-conviction court held no evidentiary hearing and failed to attach appropriate portions of record to its opinion "goes to issues unrelated to the cause of petitioner's detention [and] does not state a basis for habeas relief").  Because Petitioner's claim appears to challenge only the process afforded him in the state collateral review proceedings and does not represent a constitutional challenge to Petitioner's confinement, it does not provide a basis for federal habeas relief.

Additionally, even if Petitioner's claim of "cumulative error" or "cumulative effect" is cognizable on federal habeas, the undersigned concludes that Petitioner failed to exhaust his claim

in the state courts.[8]  The record shows that on direct appeal of the trial court's denial of Petitioner's

Rule 3.850 motion, Petitioner raised the following claim:

> <u>Issue I</u>
> The court erred in summarily denying Appellant's motion by failing to conduct
> cumulative error analysis as required in postconviction relief matters as specifically
> requested.

(Doc. 17, Ex. BBB at i, 7).  Petitioner argued that cumulative error analysis was mandated in all

3.850 matters, citing <u>Cherry v. State</u>, 659 So. 2d 1069 (Fla. 1995), <u>Jones v. State</u>, 709 So. 2d 512

(Fla. 1998), <u>Lightbourne v. State</u>, 742 So. 2d 238, 247 (Fla. 1998), and <u>Roberts v. State</u>, 840 So. 2d

962 (Fla. 2002) (<i>id.</i> at 7).  He argued that the post-conviction trial court misapplied the law by

reviewing his claims individually and denying many of them on the ground that the alleged error

---

[8]Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary, <i>see</i> <u>United State v. Adams</u>, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing <u>United States v. Preciado-Cordobas</u>, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)), the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254, nor has the Eleventh Circuit recognized any Supreme Court case as the clearly establishing federal law governing such a claim for purposes of § 2254 review under the AEDPA. <i>See, e.g.,</i> <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); <u>Sims v. Singletary</u>, 155 F.3d 1297 (11th Cir. 1998) (applying pre-ADEPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); <u>Cargill v. Turpin</u>, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); <u>Dobbs v. Kemp</u>, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); <u>Bronstein v. Wainwright</u>, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).  The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas.  The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas.  <i>See</i> <u>Williams v. Anderson</u>, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); <u>Fisher v. Angelone</u>, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief.").  The Ninth Circuit recognizes cumulative error claims and expressly recognized <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973) as the clearly established federal law governing such claims.  <i>See</i> <u>Parle v. Runnels</u>, 505 F.3d 922, 928–29 (9th Cir. 2007).  The Tenth Circuit recognizes cumulative error claims and recognized <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993) as the clearly established federal law on this issue. <i>See</i> <u>Darks v. Mullin</u>, 327 F.3d 1001, 1018 (10th Cir. 2003).  The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of <u>Strickland</u>. <i>See</i> <u>Williams v. Washington</u>, 59 F.3d 673, 682–84 (7th Cir. 1995); <u>Rodriguez v. Hoke</u>, 928 F.2d 534 (2d Cir. 1991).

was harmless or Petitioner failed to show that the error was prejudicial, without determining whether error occurred and without considering the cumulative effect of the alleged errors (*id.* at 7–15).

    As previously discussed, to present a federal constitutional claim properly in state court, "the petitioner must make the state court aware that the claims asserted present federal constitutional issues." Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998).  "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." Duncan, 513 U.S. at 365–66.  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made."  Anderson, 459 U.S. at 6. "[T]o exhaust state remedies, petitioners must do more than present 'the state courts only with the facts necessary to state a claim for relief' and must additionally articulate the constitutional theory serving as the basis for relief."  Henry v. Dep't of Corr., 197 F.3d 1361, 1366 (11th Cir. 1999) (quoting Gray v. Netherland, 518 U.S. 152, 116 S. Ct. 2074, 2081, 135 L. Ed .2d 457 (1996)).

    Petitioner did not state a federal law basis for his claim in his state court brief.  For example, he did not cite in conjunction with the "cumulative error" claim a federal source of law or a state case deciding such a claim of cumulative effect or cumulative error on federal grounds; indeed he did not even label his claim "federal" (*id.*).[9]  If Petitioner wished to claim that the cumulative effect

---

    [9]As previously noted, in his post-conviction appellate brief, Petitioner relied upon Cherry v. State, Jones v. State, Lightbourne v. State, and Roberts v. State, *supra*, in support of his claim that the Rule 3.850 court erred by failing to analyze the cumulative effect of all individual errors alleged in his Rule 3.850 motion (*see* Doc. 17, Ex. BBB at 7). However, none of these cases were decided on federal grounds.

    In Cherry v. State, the defendant raised several individual claims of ineffective assistance of counsel and Brady violations, but he did not raise a claim that the cumulative effect of the alleged errors denied him due process or a fundamentally fair trial. 659 So. 2d at 1071 n.1.  The Florida Supreme Court applied Strickland v. Washington, 466 U.S. 668 (1984) in denying the ineffective assistance of counsel claims, on the ground that Cherry failed to satisfy either the deficient performance or the prejudice prong, *see id.* at 1072–73, and the court applied Brady v. Maryland, 373 U.S. 83 (1963) in denying the Brady claims, separately analyzing each claim, *see id.* at 1073–74.  The court did not assess the cumulative effect of all of the errors alleged in the defendant's post-conviction motion.

    In Jones v. State, the defendant claimed that the cumulative effect of newly discovered evidence and the trial court's failure to consider the cumulative effect of such evidence entitled him to a new trial.  709 So. 2d 512, 517 (Fla. 1998).  The Florida Supreme Court applied its own precedent, Swafford v. State, 679 So. 2d 736 (Fla. 1996) in holding that when a prior evidentiary hearing has been conducted, "the trial court is required to 'consider all newly discovered evidence which would be admissible' at trial and then evaluate the 'weight of both the newly discovered evidence and the evidence which was introduced at the trial'" in determining whether the evidence would probably produce a different result on retrial.  *Id.* at 526.  The court did not decide the cumulative effect issue on federal grounds.

of all errors, including alleged trial court errors and alleged errors of defense counsel, deprived him of due process and a fundamentally fair trial guaranteed by the federal Constitution, he should have said so in his state court brief.  Because Petitioner did not alert the state courts that his claim was federal in nature, the undersigned concludes that he did not satisfy the exhaustion requirement of section 2254.  *See* Duncan, 513 U.S. at 365; Zeigler v. Crosby, 345 F.3d 1300, 1307 (11th Cir. 2003) (finding that the petitioner's federal habeas claims were not raised in the state court when the direct appeal made no reference to the federal constitutional issues raised in the federal habeas petition).

Petitioner would be precluded from now raising this claim in the state courts as the state procedural rules do not provide for a second appeal of a Rule 3.850 motion, and a second Rule 3.850 motion would be subject to dismissal as a successive motion, pursuant to Rule 3.850(f).  Therefore, the claim is procedurally defaulted.   Petitioner does not allege cause for his failure to present his

---

In Lightbourne v. State, the defendant raised the following claims:  (1) the trial court denied the defendant a full and fair evidentiary hearing by refusing to consider the substance of a newly discovered witness's testimony in the post-conviction proceedings; (2) the State withheld exculpatory evidence and presented false testimony in violation of the defendant's constitutional rights; (3) newly discovered evidence established that the defendant was entitled to a new sentencing proceeding; (4) the trial court applied the wrong standard in reviewing the defendant's claims and failed to consider the cumulative effect of all the evidence discovered since his trial; and (5) the defendant's due process and equal protection rights were violated by the participation of an assistant state attorney, who may have been a material witness, in the post-conviction proceedings.  742 So. 2d 238, 246–47 (Fla. 1999).  The Florida Supreme Court held that under State v. Spaziano, 692 So. 2d 174 (Fla. 1997), Armstrong v. State, 642 So. 2d 730 (Fla. 1994), and Jones v. State, *supra*, the trial court should have conducted a cumulative analysis of the evidence presented in the post-conviction proceedings in evaluating the defendant's claims.  *Id.* at 245, 247–49.  Although the Florida Supreme Court cited Kyles v. Whitley, 514 U.S. 419 (1995) in its analysis of the issue, the court cited it for the proposition that the cumulative analysis required by Jones, "is similar to the cumulative analysis that must be conducted when considering the materiality prong of a Brady claim." *Id.* at 247–48 (citing Kyles, *supra*).  Thus, the state court decided Lightbourne's cumulative effect claim on state, not federal, grounds.

In Roberts v. State, the defendant claimed that the post-conviction trial court erred by failing to conduct a cumulative analysis of the claims he raised in his instant post-conviction proceeding, some of which were claims of newly discovered evidence, and the claims he had raised in a prior post-conviction proceeding.  840 So. 2d 962, 967 (Fla. 2002).  Relying on Lighthouse and Jones, *supra*, the Florida Supreme Court held that in determining whether newly discovered evidence warranted a new trial, Florida law required the trial court to consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at trial to determine whether the evidence would probably produce a different result on retrial.  *Id.* at 972.  The court also noted, however, that "claims of cumulative error are properly denied where individual claims have been found without merit or procedurally barred."  *Id.* (citing Rose v. State, 774 So. 2d 629, 637 (Fla. 2000); Downs v. State, 740 So. 2d 506, 509 n.5 (Fla. 1999)).  Thus, the state court decided Roberts's cumulative effect claim on state, not federal, grounds.

federal claim in the state courts, or that he will suffer prejudice as a result of this court's failure to review the claim.

Furthermore, Petitioner has failed to show that he is entitled to review under the "fundamental miscarriage of justice" exception to the procedural bar.  As previously discussed, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup, 513 U.S. at 327. In Schlup, the Supreme Court set forth the standard of proof governing a habeas petitioner's procedural claim of actual innocence:  the petitioner must show that constitutional error "probably resulted" in the conviction of one who is actually innocent.  513 U.S. at 324, 326–27.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

Id. (citation omitted).

The Schlup Court went on to make several observations about this standard.  With respect to the term "probably resulted," the Court clarified that, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  513 U.S. at 327, 330 (emphasis added).  With respect to the term "reasonable juror," the Court instructed:   "It must be presumed that a reasonable juror would consider fairly all of the evidence presented.  It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Id. at 329.  Additionally, it is important to note in this regard that "actual innocence" means factual innocence, not mere legal insufficiency.  See Bousley v. United States, 523 U.S. 614, 623–24, 118 S. Ct. 1604, 1611–12, 140 L. Ed. 2d 828 (1998) (citing Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518–19, 120 L. Ed. 2d 269 (1992)).

In assessing the adequacy of the petitioner's showing, the district court "is not bound by the rules of admissibility that would govern at trial."  Schlup, 513 U.S. at 329.  Instead, the court is allowed also to consider "the probative force of relevant evidence . . .  'including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably

claimed to have been wrongly excluded or to have become available only after the trial.'" *Id.*, 513 U.S. at 328 (quoting Friendly, Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

In the instant case, the undersigned liberally construes Petitioner's claim of newly discovered evidence asserted in Ground Three of the instant petition, as asserting a claim of actual innocence to show that he qualifies for application of the "fundamental miscarriage of justice" exception to the procedural bar.  In Ground Three, Petitioner states that in the year 2000, eight years after his trial, he obtained information through a public records request to the Pensacola Police Department that on December 20, 1991, a few months prior to Petitioner's arrest, the victim notified local police that two vehicles parked at her residence, one of which was in her carport, had been burglarized (Doc. 1 at 32–33; Doc. 33 at 53–66).  Petitioner contends he had an alibi for December 20, 1991, and this evidence of the previous incident reinforced his defense that someone else was at the victim's house on April 5, 1992,  the date of the offenses in this case, and left the tote bag containing a gun, ammunition, a crowbar, racquetball, screwdriver, butcher knife, nylon dog leash, condoms, roll of surgical tape, and surgical gloves, near the victim's driveway in her front lawn, as well as a mask and gloves in a tree in the victim's backyard (Doc. 1 at 33–34).  Petitioner states the evidence adduced at trial showed that the victim initially described the prowler at her home on April 5, 1992, as a black man wearing a stocking cap, and the new evidence of the vehicle break-ins in December of 1991 shows that the same person who committed the break-ins in December of 1991 was present at the crime scene in April of 1992 (*id.*).  Petitioner additionally states this new evidence could have been used to impeach the victim's testimony because she was asked, in both her deposition and at trial, whether she was aware of any other criminal activity in her neighborhood and whether she had made any other calls to police besides her call on April 5, 1992, and the victim "lied and denied any such knowledge" (*id.* at 32).

Initially, the new evidence presented by Petitioner is not of the nature that qualifies for consideration under the "fundamental miscarriage of justice" exception.  The Supreme Court described such qualifying evidence as "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence —that was not presented at trial."  Schlup, 513 U.S. at 324.  The police department's service call record indicating that the

victim had reported vehicle break-ins to police on December 20, 1991, is not exculpatory in nature as it does not suggest that Petitioner did not commit the crimes perpetrated on April 5, 1992.

Additionally, although Petitioner suggests the "new evidence" had impeachment value in that it discredited the victim's testimony, he has failed to show that the evidence was inconsistent with the victim's testimony or otherwise called into question the reliability or veracity of her testimony. Contrary to Petitioner's assertions that the victim was asked at trial whether she was aware of any other criminal activity in her neighborhood and whether she had made any other calls to the police other than the calls concerning April 5, 1992 (*see* Doc. 1 at 32; Doc. 33 at 36–40), the trial transcript shows that the victim was not asked these questions.  The victim was asked whether any incident occurred around her house shortly after she met Petitioner in July of 1991, and she testified that she first noticed something unusual in October (Doc. 17, Ex. K at 116).  She stated that she was outside on the deck which runs level with the first floor of her house at approximately 9:00 or 9:30 p.m. and heard footsteps down the driveway of her home (*id.*).  She testified she ran inside the house and looked out the glass doors of the carport but did not see anything (*id.* at 117).  She then ran upstairs, went onto her front porch, and looked to the street (*id.*).  She saw brake lights of a car parked in front of the Sauer's house next door, which was under construction, and saw the car turn around in the street (*id.*).  She went back inside the house and looked out a window and saw the car pass in front of her house (*id.*).  She saw the person driving the car and later realized that Petitioner matched her description of the driver (*id.* at 117–18).  The victim was then asked whether any other incidents occurred around the house next door, and she responded that she heard noises underneath her house and in the Sauer's house next door (*id.* at 118).  She testified the noises occurred approximately once a week on a weekday at night, and always when only she and her children were at home (*id.* at 118–19).  She testified that occasionally someone stayed in the house with her when the children were gone, but the incidents she described never occurred when the children were gone and someone else was with her (*id.* at 119).  She testified that these incidents continued until Petitioner was arrested on April 5, 1992, and since his arrest there had been no other noises or events in the house next door (*id.*).  Evidence that the victim's car and the car of someone who was staying with her were burglarized on December 20, 1991, is also not inconsistent with the victim's testimony that the weekly noises she heard and the incident where she heard footsteps on her driveway occurred when

only she and her children were in the house.  The police reports of the vehicle break-ins, copies of which were submitted by Petitioner, show that the victim told police <u>she did not hear anything</u> on the night the vehicles were burglarized and discovered the break-ins only when she went to her vehicle the next morning (*see* Doc. 33 at 64) (emphasis added).  Therefore, the new evidence had little, if any, impeachment value.[10]

---

[10]Contrary to Petitioner's assertions, the evidence that the victim reported vehicle break-ins to the police on December 20, 1991, is not inconsistent with the victim's deposition testimony either.  At her deposition, the victim was questioned as follows:

> Q.      Do you recall having—any of the other neighbors having prowler problems or vandalism at their residences during the construction of this house next door to you, any other neighbors complain of things happening?

> A.      Well, my one neighbor had—I think somebody put kerosene in their lawnmower at some point.  It might not have been during this period of time.  I'm not sure.

> Q.      Any vehicle break-ins?

> A.      Not of my neighbors that I know of, no.

> Q.      Your notification to law enforcement consisted of two times, is that correct, that you had a prowler, you were nervous about what was going on around your house?

> A.      I spoke to several officers on several different occasions.  I don't know what was noted at the police department and what wasn't.

> Q.      I'm talking about phone calls to the police department to record anything amiss?

> A.      I only reported two things, yes.  Well, that's not true.  That's not true.

> Q.      Did you call more than twice?

> A.      Yes, I did.  I had a special watch put on my house.  About a week before this.  And I had a special watch at another time put on my house before that.

> Q.      So you had been talking to law enforcement over a period of time about prowlers at your house?

> A.      Yes.

(*see* Doc. 33 at 48–49).  The police department's service call record showing the vehicle break-ins at the victim's home is not inconsistent with the victim's statements regarding her awareness of her neighbors' problems with vehicle break-ins, prowlers, and vandalism.  Additionally, Petitioner's allegation that the police record proves that the victim lied about making multiple calls to police is undermined by his own admission that the data base of police service calls did not exist until the winter of 1991 (*see* Doc. 33 at 38–39); therefore, the absence of a record of service calls to the victim's home prior to December of 1991 does not prove that she did not make the calls.

Most importantly, in light of the evidence adduced at trial, the undersigned concludes that Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him even if the jury had considered evidence of vehicle break-ins at the victim's home in December of 1991.  The undisputed trial evidence showed that the victim called 911 after seeing a person near her front door, and Petitioner admitted his presence near the victim's front door and in her carport on April 5, 1992.  Furthermore, the jury was presented with evidence that the victim told the 911 dispatcher that she saw a black male wearing some type of head covering and carrying a flashlight, which did not describe Petitioner, but the jury convicted Petitioner despite this evidence that the victim's description was not consistent with Petitioner's appearance.  Moreover, Petitioner has provided nothing to support his speculation that the black male described by the victim was the same person who committed the vehicle break-ins.  Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him even if the jury had considered evidence of the vehicle break-ins at the victim's home in December of 1991.  Therefore, he has failed to demonstrate that his claim qualifies for review under the "fundamental miscarriage of justice" exception to the procedural bar.

In sum, Petitioner failed to exhaust his "cumulative error" claim in the state courts and is now procedurally barred from doing so.  Furthermore, he has failed to demonstrate he is entitled to federal review of his claim through any exception to the procedural bar.  Therefore, he is not entitled to relief on this claim.

C.       Ground three:  "Unreasonable fact determination was employed to summarily deny post-conviction 3.850 motion claims."

Petitioner claims that the trial court's factual findings with regard to Grounds 25 and 32 of his first Rule 3.850 motion and his claim of newly discovered evidence raised in the second Rule 3.850 motion, which the undersigned will refer to as Ground 47, were unreasonable and unsupported by the record (Doc. 1 at 31–38, 47–50).

1.       State post-conviction Ground 25

In Ground 25, Petitioner claimed that his trial counsel was ineffective for failing to argue that Petitioner abandoned any attempt to commit sexual battery when Officer Sheehan announced her arrival, which occurred before Petitioner entered the victim's enclosed, fenced-in back yard, thus,

there was no evidence Petitioner intended to commit sexual battery at the time he entered the structure, dwelling, or its curtilage.(*see* Doc. 17, Ex. JJ at 162).  Petitioner contended that if counsel had argued this point during closing argument and in his motion for judgment of acquittal, Petitioner would have been acquitted of armed burglary (*id.*).

a.     <u>Clearly Established Supreme Court Law</u>

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.  Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied.  <u>Turner v. Crosby</u>, 339 F.3d 1247, 1279 (11th Cir. 2003); <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would

have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the <u>Strickland</u>, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Strickland</u>, 466 U.S. at 693. However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<u>Id.</u> at 694. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. <u>Strickland</u>, 466 U.S. at 698, 104 S. Ct. at 2070; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

b.   <u>Federal Review of State Court Decision</u>

In the state court's written opinion denying Petitioner's Rule 3.850 motion, the state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing claims of ineffective assistance of counsel (Doc. 17, Ex. YY at 764). Because the state court correctly identified <u>Strickland</u> as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of <u>Strickland</u>.

The state court determined that, as a matter of state law, to convict a defendant of burglary, the State must prove that the defendant entered a structure, dwelling, or its curtilage (Doc. 17, Ex. K at 793–94) (citing Fla. Stat. §§ 810.011(1), 810.02(1)).  The court also determined that the trial evidence showed that Petitioner entered the curtilage, and this evidence included the victim's testimony that her entire yard was fenced, the victim's testimony that she first spotted Petitioner in her window, and the testimony of Officer Sheehan that she saw Petitioner in the victim's carport under the victim's house when she arrived at the scene (*id.* at 794).  The state court determined that because there was some evidence that Petitioner had entered the curtilage, as defined by state law, defense counsel did not perform deficiently by failing to argue there was no evidence that Petitioner entered the curtilage prior to his awareness that the police arrived (*id.*).  The state court further determined that to the extent Petitioner was challenging the sufficiency of the evidence to support the armed burglary count, the issue should have been raised on direct appeal of the conviction, not in a Rule 3.850 motion (*id.*).

Petitioner contends that according to Florida cases, the state court erred in concluding that the testimony of the victim and Officer Sheehan constituted some evidence that he entered the curtilage (Doc. 1 at 34–38, 47–48).  He additionally contends that the state court's factual finding that the victim testified that her entire yard was fenced was unreasonable because the victim actually testified that only her backyard was fenced, and photographs of the yard, admitted as evidence at trial, verified that the front and sides of the victim's house were not fenced.  These photographs are the subject of Petitioner's motion for an evidentiary hearing on the issue of whether the victim's front yard was enclosed in any way (*see* Doc. 42).  Although the undersigned initially determined that the photographs of the victim's front yard were relevant to Ground Three of the instant petition and directed Respondent to supply them (*see* Doc. 37), that determination was made upon only preliminary review of the pleadings.  Now, upon full consideration of the petition and the state court record, the undersigned concludes that even if this court afforded no deference to the state court's determination that the victim's entire lawn was fenced, the record conclusively establishes that Petitioner is not entitled to federal habeas relief.

At the time of Petitioner's offense conduct, burglary was defined as "entering or remaining in a structure, or a conveyance with the intent to commit an offense therein, unless the premises are

at the time open to the public or the defendant is licensed or invited to enter or remain"  Fla. Stat. § 810.02(1)(a) (1991); *see also* Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part Two:  Instruction on Crimes, Chapter 13.1 Burglary (2007) (this language of the instruction was adopted in 1981 and in effect until 2003).  For purposes of the burglary statute, "structure" was defined as "a building of any kind, either temporary or permanent, which has a roof over it, together with the curtilage thereof."  Fla. Stat. § 810.011(1) (1991).  "Dwelling" was defined as "a building or conveyance of any kind, either temporary or permanent, mobile or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night, together with the curtilage thereof."  *See* Fla. Stat. § 810.011(2) (1991).  The jury instructions in effect at that time interpreted curtilage to mean "the enclosed space of ground and outbuildings immediately surrounding" the structure or dwelling.  *See* The Florida Bar 2007 Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part Two:  Instruction on Crimes, Chapter 13.1 Burglary (2007) (this language of the instruction was adopted in 1981 and has not been amended).  At the time of Petitioner's offense conduct and trial in 1992, the law of the First DCA, which was the controlling law in the circuit court where Petitioner was tried, was that "curtilage" of a dwelling included the driveway, for purposes of the burglary statute.  J.E.S. v. State, 453 So. 2d 168 (Fla. 1st DCA 1984).  Indeed, at that time Florida courts did not follow a strict requirement of an enclosure in interpreting "curtilage," and the various interpretations caused the Florida Supreme Court to address the issue in 1995 in State v. Hamilton, 660 So. 2d 1038 (Fla. 1995).  In Hamilton, the state supreme court held that the term "curtilage" as used in the burglary statute must be interpreted to require some form of enclosure.  *Id.* at 1044.

In the instant case, Petitioner failed to establish that defense counsel performed unreasonably by failing to argue that Petitioner entered the curtilage only <u>after</u> he had abandoned any intent to commit sexual battery, that is, upon his awareness that the police had arrived.  The trial evidence was undisputed that Petitioner was in the victim's carport prior to his awareness of the police officer's presence.  Petitioner admitted at trial that he entered the victim's carport, went to the front of her vehicle and felt the radiator, and then went to the right front tire and felt the brake lines before he heard what he believed to be footsteps on the driveway coming in his direction (Doc. 17, Ex. K at 517–18, 559). Officer Sheehan testified that when she arrived at the victim's home, she started

walking up the driveway and saw Petitioner at the front of the van, which was parked in the carport "nose into the house," and as she drew closer, he moved to the passenger side of the van, still in the carport, and knelt down (*id.* at 137, 150, 167–73).   The victim testified that the carport was "underneath" a story of her house, and that the door of a small entry area of the house opened into the carport (*id.* at 74–75, 92, 94, *see also id.* at 522).   Additionally, the victim testified that before she called the police, she saw the prowler walking "close to [her] driveway headed towards [her] front door" and then "head back towards [her] driveway" (*id.* at 76–77).   In light of the unsettled state of the law at the time of Petitioner's trial with regard to whether "curtilage" required some form of enclosure, as well as the undisputed evidence that Petitioner was in the carport, which was somewhat enclosed by virtue of the fact that it was under a story of the house and a door of the house opened into it, defense counsel's failure to argue that Petitioner abandoned any intent to commit sexual battery prior to entering the curtilage was not unreasonable.   *See* J.E.S., 453 So. 2d at 168 ("curtilage" of dwelling included driveway, for purposes of burglary statute); *see also* State v. Burston, 693 So. 2d 600, 601 (Fla. 2d DCA 1997) (reversing trial court's dismissal of information charging defendant with burglarizing a dwelling in violation of section 810.02, Florida Statutes (1993) [the 1993 version was the same as the 1991 version] where defendant stole lawnmower from carport, which was contiguous to dwelling, consisted of cement slab, had roof flush with roof of dwelling, shared wall with dwelling, dwelling door opened onto carport, and carport was no longer used for parking vehicles and contained miscellaneous items); Tindall v. State, 997 So. 2d 1260, 1261 (Fla. 5th DCA 2009) (affirming conviction for burglary of a structure where defendant penetrated invisible, vertical plane into airspace of house by crawling into crawl space under house and thus "entered" house, which is a "structure" under burglary statute, and stating in dictum that a carport is "structure" because it is a building with a roof); *but see* Small v. State, 710 So. 2d 591 (Fla. 4th DCA 1998) (holding that trial court erred in denying motion to dismiss charge of burglary of a structure where subject of burglary—open carport attached to residence, walled on only one side and otherwise supported only with poles—was not burglarizable "structure" within meaning of burglary statute, but may be burglarizable portion of "dwelling"), *called into doubt by* Tindall, *supra*.   Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

        2.        State post-conviction Ground 32

In Ground 32, Petitioner claimed that his trial counsel was ineffective for failing to argue that there was no evidence that Petitioner had entered or remained in a dwelling, structure, or conveyance while armed, or that he ever became armed within such dwelling, structure, or conveyance, as required for a conviction of armed burglary (Doc. 17, Ex. MM at 276–78).  He additionally claimed that counsel was ineffective for failing to object to the trial court's erroneous jury instruction regarding the definition of "structure" (*id.*).

### a.   Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

### b.   Federal Review of State Court Decision

In denying Petitioner's claim that defense counsel failed to argue that there was no evidence that Petitioner had entered or remained in a dwelling, structure, or conveyance while armed, or that he ever became armed within such dwelling, structure, or conveyance, as required for a conviction of armed burglary, the state court found as fact that defense counsel told the jury during closing arguments that "there was nobody, nobody has testified here or has testified that Jay Klauer had possession of that firearm" (*see* Doc. 17, Ex. YY at 799).  The court determined that since counsel actually did argue that the State did not present any evidence that Petitioner was armed, Petitioner failed to show that counsel performed deficiently (*id.*).

Petitioner failed to present clear and convincing evidence rebutting the state court's finding that counsel did, in fact, argue that the State did not present any evidence that Petitioner was armed.  Furthermore, the trial transcript confirms that counsel argued there was no evidence that Petitioner had entered or remained in a dwelling, structure, or conveyance while armed, or that he ever became armed within such dwelling, structure, or conveyance.  Counsel's argument included the following, in relevant part:

> One of the things that makes this whole system work is common sense.  And what you find is somebody that walks on a driveway we have now heard from the State can be convicted of a burglary of a dwelling with intent to commit rape.  If you walk on the driveway of somebody's house, that's what he's asking you to convict him of.  He is asking you to convict on the fact that he walked through—Jay Klauer walked through an open carport, that is burglary of a dwelling house with intent to commit rape.  Isn't that incorrect?  Lois Jernigan herself says she never saw him put

his hands on her house, never touched it.  And the Judge is not going to say the things to you that Mr. Hill did.  The Judge is going to read to you what the law is . . . . There is no doubt that Jay Klauer was on her front lawn.  And I sure don't think that makes you guilty of burglarizing a person's home.

. . . .

        The Judge is not going to tell you that walking across somebody's lawn is burglary in the State of Florida.

. . . .

    And I think a lot of you going by your neighbor's house, how about people cutting through your yard and it happens all the time in my neighborhood.  Every one of them is going to go to jail, is that what the State want [sic] to do here?  Cut through somebody's carport, that is not a burglary of a dwelling.  That is not enclosed to walk around . . . .

. . . .

    There is also going to be included in that while doing this burglary, if you find one that Jay Klauer was armed with a firearm—a firearm is found way out here on the front as we know.  And there was nobody, nobody has testified here or has testified that Jay Klauer had possession of that firearm.  There was no one that will testify that any of the items in that bag were in the possession of Jay Klauer.

(Doc. 17, Ex. K at 609–12).  Therefore, counsel actually made the argument that Petitioner faults him for not making, that is, that there was no evidence that Petitioner had entered or remained in a dwelling, structure, or conveyance while armed, or that he ever became armed within such dwelling, structure, or conveyance.  Additionally, counsel argued in his motion for judgment of acquittal that the State failed to present evidence to convict Petitioner of armed robbery, specifically, that there was no evidence that he ever possessed the firearm or that his fingerprints were on it, and the firearm was found 60–70 feet away from Petitioner (*id.* at 302, 307–08).  Therefore, Petitioner failed to demonstrate that defense counsel performed unreasonable in this regard.

    As to the second part of this claim, Petitioner claimed that defense counsel was ineffective for failing to object to the court's erroneous jury instruction that the definition of "structure" included "the enclosed space <u>or</u> ground and outbuildings immediately surrounding [the] structure," instead of the correct definition that "structure" included "the enclosed space <u>of</u> ground and outbuildings immediately surrounding [the] structure" (Doc. 17, Ex. MM at 276–78).  Petitioner contended there was no evidence he had a dangerous weapon within the structure because the tote bag containing the gun was found in an open area of the front lawn (*id.*).

The state court denied this claim on the ground that the difference in the definitions of structure was "slight," and Petitioner failed to explain how changing the "or" to "of" would have resulted in an acquittal on the armed burglary charge (Doc. 17, Ex. YY at 800).  Additionally, the court held that the Florida armed burglary statute did not require that Petitioner be armed within the structure, it required only that he be armed in the course of committing the offense, and an act is "in the course of committing" if it occurs in the attempt to commit the offense or in the flight after the attempt or commission (*id.*).  The court determined that the question of whether Petitioner was armed either inside or outside the structure made no difference because the evidence showed that Petitioner was armed in the course of committing the offense (*id.*).  Therefore, Petitioner failed to show that he was prejudiced by counsel's failure to object to the erroneous instruction (*id.*).

Petitioner contends the jury was confused as to whether "enclosed" applied to "ground" or only to "space," and the trial court's misreading the instruction "forced" the jury to find that the unenclosed front lawn where Petitioner was spotted by the victim through her front window, and the area beside the driveway on the lawn where the gun was located, was "structure" (Doc. 1 at 36, 38).  In support of this argument, he relies on the fact that after the judge read the jury instructions, the jury sent the following question to the judge:  "Define structure or dwelling—is ground around the house part of the dwelling." (*see* Doc. 1 at 35–36; Doc. 17, Ex. M).  The judge, with the consent of counsel, responded to the question by re-reading the definitions of "structure" and "dwelling", which included the erroneous substitution of "or" for "of" in the definition of structure as "any building of any kind . . . that has a roof over it and the enclosed space or ground and outbuildings immediately surrounding that structure" (Doc. 17, Ex. K at 672–74).  The written instructions were not given to the jury during deliberations (*id.* at 671).

Initially, Petitioner has failed to demonstrate that the state court's determination that the difference in the definitions of structure was "slight," and that Petitioner failed to explain how changing the "or" to "of" would have resulted in an acquittal on the armed burglary charge, was unreasonable.  Although the jury's question to the judge indicates that they were confused as to whether the ground around the house was included in the definition of "structure" or "dwelling," Petitioner has failed to show that the jury was confused as to whether "enclosed" applied to "ground," or that the change in verbiage led the jury to expand the definition of "structure" or

"dwelling" for purposes of the burglary statute.   Therefore, the court cannot say that defense counsel was "constitutionally compelled" to object to the jury instruction.  *See* <u>Chander</u>, 218 F.3d at 1313 (in evaluating counsel's performance, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled'") (citing <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)).

Furthermore, even if the instruction was properly read, according to the law at the time of Petitioner's trial, the driveway and the victim's carport underneath a story of her house each satisfied the definition of "structure."  Therefore, Petitioner has failed to show a reasonable probability that he would have been acquitted of the burglary charge if defense counsel had objected to the instruction and the court had corrected it.

Additionally, Petitioner has failed to demonstrate that defense counsel's failure to object to the definition of "structure" prejudiced him with regard to the imposition of the "armed" aggravating circumstance.  Petitioner contends the erroneous jury instruction permitted the jury to impose the "armed" aggravating circumstance even though the gun was never in the "structure" but on the unenclosed front lawn (*see* Doc. 1 at 36–38).  Petitioner argues that the state court's determination that he was not prejudiced by the erroneous instruction was based upon an erroneous determination that Florida law required only that the defendant be armed in the course of committing the offense, not that the defendant be armed within the structure (*id.* at 36–38, 47–50).

Although whether trial counsel was constitutionally ineffective is a question of federal law, when the answer to that question turns on whether counsel should have made certain arguments or objections based upon state law, Section 2254(d) requires the federal court to defer to the state court's decision regarding its own laws.  "[S]tate courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law and not second-guess them on such matters.  <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886, 44 L. Ed. 2d 508 (1975) (citations and footnote omitted); *see also* <u>Herring v. Sec'y Dep't Corr.</u>, 397 F.3d 1338, 1354–55 (11th Cir. 2005); <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1055 (11th Cir. 1983). Therefore, this court must defer to the state court's determinations that (1) the Florida armed burglary statute did not require that Petitioner be armed within the structure, it required only that he be armed in the course of committing the offense, (2) an act is "in the course of committing" if it

occurs in the attempt to commit the offense or in the flight after the attempt or commission, and (3) under Florida law, whether Petitioner was armed either inside or outside the structure made no difference (*id.*).  In light of the state court's rulings on the state law issues, most importantly, its ruling that the armed burglary statute did not require that Petitioner be armed within the structure or dwelling, Petitioner failed to show a reasonable probability that he would have been acquitted of armed burglary if counsel had objected to the definition of "structure" in the jury instructions. Therefore, Petitioner failed to demonstrate that the state court's denial of his claim was based upon an unreasonable determination of the facts or was an unreasonable application of <u>Strickland</u>.

3.    State post-conviction Ground 47

As previously discussed, in Ground 47 of Petitioner's Rule 3.850 motion, he claimed that he obtained newly discovered evidence that could have been used to impeach the victim at trial (*see* Doc. 17, Ex. XX at 754–57).  He alleged that in 2000, he obtained information through a public records request to the Pensacola Police Department that on December 20, 1991, a few months prior to Petitioner's arrest, the victim notified local police that two vehicles parked at her residence, one of which was in her carport, had been burglarized (Doc. 1 at 32–33; Doc. 33 at 53–66).  Petitioner states this evidence could have been used to impeach the victim because she was asked, in both her deposition and at trial, whether she was aware of any other criminal activity in her neighborhood and whether she had made any other calls to police besides her call on April 5, 1992, the date of the offenses in this case, and the victim "lied and denied any such knowledge" (*id.* at 32).  Petitioner contends he had an alibi for December 20, 1991, and this evidence reinforced his defense that someone else, specifically, a black man, was at the victim's house on April 5, 1992, and left the tote bag containing the gun on the victim's lawn (*id.* at 33–34).

Respondent contends that although Petitioner alleged in a single sentence in his Rule 3.850 motion that the State's withholding of this information constituted a <u>Brady</u> violation, and he included the same sentence in his brief to the First DCA (*see* Doc. 17 at 60–61, Ex. XX at 757, Ex. BBB at 16, Ex. DDD), he did not allege a <u>Brady</u> violation in his federal petition; rather, he claimed only that the state court's denial of his claim of newly discovered evidence was based on an unreasonable determination of the facts (*see* Doc. 1 at 31–34, 47–50).  Therefore, the only matter properly before this court is whether the state court's denial of Petitioner's request for a new trial

based upon newly discovered evidence was based on an unreasonable determination of the facts or contrary to or an unreasonable application of Supreme Court law (*see* Doc. 17 at 61).  Respondent further contends that as to this issue, that is, the state court's rejection of Petitioner's claim of newly discovered evidence, the claim does not provide a valid basis for federal habeas relief because it did not present a federal claim to the state court, only an issue of state law (*id.* at 62–63).

In Petitioner's reply brief, he contends that Respondent's claim that he did not assert a <u>Brady</u> violation in his federal petition is a "red herring" (Doc. 33 at 34).  He states that the allegations in his "motion" included every essential factual element of a <u>Brady</u> claim (*id.* at 41), and he argues, for the first time in this federal habeas proceeding, that the State possessed and suppressed material favorable evidence which was "prejudicial to his cause" (*id.*).  He states he was not required to label the error by the name of the case that recognized it, because doing so is "purely a semantic convenience" (*id.*).

Review of Petitioner's federal petition confirms Respondent's assertion that Petitioner has not properly raised a <u>Brady</u> claim in this federal habeas proceeding.  In his federal petition, Petitioner claims that the state court unreasonably denied his claim of newly discovered evidence on the grounds that Petitioner failed to show that the newly discovered evidence could not have been discovered through the exercise of due diligence, and the new evidence was more damaging than exculpatory (*see* Doc. 1 at 33–34; Doc. 17, Ex. YY at 810–11).  Nowhere in the federal petition or the supporting legal memorandum does Petitioner allege that the <u>State</u>, as opposed to the victim, failed to disclose that two vehicles had been burglarized at the victim's home in December of 1991. Therefore, the <u>Brady</u> claim, asserted for the first time in Petitioner's reply, was not properly raised in his habeas petition.  Furthermore, Petitioner could not amend his petition "as a matter of course" by including a <u>Brady</u> in his reply because Respondent had already served its answer.  *See* Fed. R . Civ. P. 15(a) (a party is permitted to amend a pleading once "as a matter of course" at any time before a responsive pleading is served or, otherwise, only by leave of court or by written consent of the adverse party); Rule 11 of the Rules Governing Section 2254 Proceedings (district court may apply the Federal Rules of Civil Procedure consistent with the Rules Governing Section 2254 Proceedings).  Moreover, Petitioner did not seek leave of court to amend his petition, and the undersigned does not construe Petitioner's reply as such a request because Petitioner expressly

stated his intent that the document be deemed a reply to Respondent's answer, and nowhere in the document does Petitioner mention a desire or intent to amend his petition or add a new claim (*see* Doc. 33).  Therefore, the only claim that is properly before this court is Petitioner's claim that the state court's denial of his claim of newly discovered evidence was unreasonable.

Initially, it is not clear from the holdings of Supreme Court cases whether a freestanding claim of actual innocence based upon newly discovered evidence is viable on federal habeas corpus review in a noncapital case.  In Herrera v. Collins, 506 U.S. 390, 417, 113 S. Ct. 853, 869, 122 L. Ed. 2d 203 (1993), the Supreme Court assumed "for the sake of argument in deciding [the] case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  However, the instant case is not a capital case, and Petitioner had a state avenue open to process his claim.  Furthermore, although the Eleventh Circuit has recognized the possibility of a freestanding actual innocence claim, *see* Felker v. Turpin, 83 F.3d 1303, 1312 (11th Cir. 1996) ("[Herrera] left open the difficult question of whether federal habeas courts may entertain convincing claims of actual innocence."), the court also recognized that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding," *see* Brownlee v. Haley, 306 F.3d 1043, 1065 (11th Cir. 2002) (quoting Herrera, 506 U.S. at 400).  As previously discussed, in the instant federal petition, Petitioner did not raise an independent constitutional violation occurring in the underlying criminal proceeding with regard to his claim of newly discovered evidence.  Therefore, his claim of newly discovered evidence does not state a ground for federal habeas relief.

Additionally, even if the court considered Petitioner's Brady claim asserted in his reply brief, he has failed to demonstrate he is entitled to federal habeas relief.  In Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The State has an obligation to disclose all exculpatory evidence within its constructive knowledge, including "evidence known to others acting on the government's

behalf in the case, including the police."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

Three elements establish a <u>Brady</u> violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.  <u>Banks v. Dretke</u>, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).  The State's duty to disclose pertains only to evidence that is advantageous to the defense, including impeachment evidence, and which, if suppressed, would deprive him of a fair trial.  <u>United States v. Bagley</u>, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

In the instant case, Petitioner failed to satisfy the first element because he failed to show that the information in the police department's service call record was either exculpatory or impeaching, as discussed *supra*.  Therefore, he is not entitled to federal habeas relief on his <u>Brady</u> claim.

Accordingly, it is **ORDERED**:

Petitioner's "Motion to Amend the Record and Take Judicial Notice, or, in the Alternative, for an Evidentiary Hearing and Appointment of Counsel for Administrative Purposes" (Doc. 42) is **DENIED**.

And it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 24<u>th</u> day of June 2009.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**

Case No. 3:07cv541/LAC/EMT